# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**WESTERN REFINING SOUTHWEST, INC.**
**And WESTERN REFINING PIPELINE, LLC,**

       **Plaintiffs,**

**vs.**                              **Civ. No.  16-442 JH/GBW**

**U.S. DEPARTMENT OF THE INTERIOR, and**
**SALLY JEWELL, in her official capacity as**
**Secretary of the Interior,**

       **Defendants.**


## MEMORANDUM OPINION AND ORDER

This case is before the Court on review of two decisions by the Interior Board of Indian Affairs ("IBIA). The Court has jurisdiction to review that decision under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. This case presents the novel question of whether the IBIA may lawfully require consent from not only the holder of a life estate in an Indian allotment, but also that person's heirs, before granting a right-of-way over the property. The Court has examined the Plaintiffs' opening brief [Doc. 44], Defendant's response [Doc. 45], and Plaintiffs' reply [Doc. 46], as well as the exhibits thereto and the administrative record provided by the parties. After reviewing these and the relevant legal precedents, the Court concludes that it was not improper for the IBIA to look to the common law to fill gaps in the relevant statutory scheme, nor was it improper for it to apply its decision retroactively to the right-of-way sought by Western. However, the IBIA erred by raising the issue *sua sponte* and then ruling on it without giving the parties an opportunity to be heard.

<u>**STANDARD OF REVIEW**</u>

Under the APA, a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord Utah Shared Access Alliance v. United States Forest Serv*., 288 F.3d 1205, 1208 (10th Cir. 2002). An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007) (quotations omitted). The Court's "inquiry under the APA must be thorough, but the standard of review is very deferential to the agency." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1165 (10th Cir. 2012) (quotations omitted). "Agency action, whether it is classified as 'formal' or 'informal,' will be set aside as arbitrary unless it is supported by 'substantial evidence' in the administrative record." *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994)).

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), the Supreme Court addressed the deference owed to an administrative agency interpreting the statute it is tasked with implementing. It concluded that if Congress has not directly addressed the precise question at issue, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974).

As discussed below, Western argues that the IBIA's decision is not entitled to deference under *Chevron*.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are not in dispute.

Plaintiffs (collectively, "Western") operate a buried crude oil pipeline that runs 75 miles from the San Juan Basin to an oil refinery near Gallup, New Mexico. The pipeline at issue here traverses tribal, federal, state, and privately-owned land, and Western holds easements for rights-of-way across 74.48 miles of the pipeline. However, this case arises from a dispute over the easement for a .52-mile segment of pipeline that crosses Navajo Indian Allotment No. 2073— land that is held in trust by the United States and allotted to individual citizens of the Navajo Nation.[1]

On June 22, 2009, Western filed an application to renew its existing right-of-way across 43 Navajo allotments, including the .52-mile portion of pipeline over Allotment No. 2073 that is at issue in this case. At the time, one of the applicable regulations stated: "The Secretary may … grant rights-of-way over and across individually owned lands without the consent of the individual Indian owners when . . . (2) The land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant." 25 C.F.R. §

---

[1] Under Indian law, "allotment" is a term of art that means a specific parcel of land, taken from a larger, common parcel, and granted to an individual. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 142 (1972).

169.3(c)(2) (Apr. 1, 2015). The regulations at that time did not address the question of how to calculate a majority interest when one or more interest holder has only a life estate in the property. Further, the record contains no evidence of any statute or previous administrative decision addressing the issue.

On August 2, 2010, the Bureau of Indian Affairs ("BIA") granted Western's request and issued a twenty-year renewal of the right of way over Allotment No. 2073. This renewal was based on consent from eight individual owners of the undivided interest in Allotment No. 2073. Among these individuals were Tom Morgan (42.5% interest) and Mary B. Tom (14.16% interest). Five others each held a .38% undivided interest, and one held an undivided 1.67% interest. By adding together each of these undivided interests, the BIA calculated that Western had obtained consent from a collective 60.26% of the undivided interests in the allotment—a majority as required by the regulation. Implicit in this calculation was the assumption—not expressly addressed by the BIA—that Mr. Morgan had the sole power to consent for his portion of the undivided interest despite the fact that he owns only a life estate in the allotment.[2] In return for their consent, the interest owners accepted compensation from Western. The BIA appraised a twenty-year easement under Allotment 2073 to be worth $2,650. However, Western paid them $6,656.00, or roughly two and a half times that amount.

Patrick Adakai, one of the five who owns a .38% undivided interest in Allotment No. 2073, appealed the BIA's decision to renew Western's right of way to the Interior Board of Indian Appeals ("IBIA"). Adakai argued that Western obtained consents from other landowners through flawed procedures and that Western paid too little in compensation. Adakai did not dispute the BIA's decision permitting Mr. Morgan to consent for his entire 42.5% undivided

---

[2] It later turned out that Ms. Tom also held only a life estate in the Allotment.

interest, even though he owned only a life estate. On January 8, 2013, the IBIA vacated the renewal of the easement not because of any flaw pointed out by Adakai, but on an issue it raised *sua sponte*: that because Mr. Morgan had only a life estate in the property and had bequeathed future remainder interests to others (referred to as "remaindermen") through "gift deeds," his consent was legally insufficient without additional consents from these "remaindermen." Neither the BIA, Western, nor Adakai had the opportunity to brief the issue.

The IBIA's decision recognized that the question had not been raised in the briefs and that then-existing regulations did not speak to the question of consent by a holder of a life estate. Thus, there was no authority directly on point. However, the IBIA asserted that it had the authority to "correct manifest error" by the BIA. Turning to "general principles of property law," the IBIA concluded that as a holder of a life estate only, Morgan lacked authority to encumber the Allotment beyond his lifetime. The IBIA then remanded the matter to the BIA. At this point, it came to light that Ms. Tom also held a life estate in the Allotment.

As a result of the IBIA's decision, Western attempted to obtain consent from both Mr. Morgan's and Ms. Tom's remaindermen. Western successfully obtained consent from Ms. Tom's remaindermen. However, Western was able to obtain consent from only four of Mr. Morgan's eight remaindermen—not a majority. The four non-consenting remaindermen, who collectively owned less than one percent of the undivided interest in Allotment 2073, demanded that Western pay them $8.6 million for renewal of an easement that had an appraised fair market value of $2,650.

On April 8, 2014, on remand from the IBIA, the BIA relied upon the 2013 IBIA decision and the denial of consent by half of Morgan's remaindermen to deny Western's easement renewal on Allotment No. 2073. Western appealed this decision to the IBIA, arguing that either

the 2010 renewal should be upheld, or in the alternative that the renewal should be allowed for Mr. Morgan's lifetime.[3] Western argued that the BIA misinterpreted the IBIA's 2013 decision, including with regard to calculating majority consent, and failed to consider the specific language of Ms. Tom's and Mr. Morgan's gift deeds. Western further argued that although in 2013 the IBIA had decided *sua sponte* the question of whether life tenants may consent to a right of way beyond their lifetimes and retain all the income, the appeal put that question before the IBIA. Western acknowledged that neither the regulations nor the General Right of Way Act of 1948 answered the dispute, but it did not argue that the IBIA lacked authority to consider general property law in resolving it.

On May 4, 2016, the IBIA denied Western's appeal in part by refusing to require the BIA to renew the right-of-way across Allotment No. 2073 for a fixed and unqualified 20-year term. Rather, the IBIA concluded that Western was entitled to a *qualified* right-of-way for 20 years or the life of Mr. Morgan or Ms. Tom, whichever is the shortest period. The IBIA reasoned that "the deeds contain no language that expressly or impliedly reserved, for the life tenants, the authority to grant an interest beyond their lifetimes." The IBIA also found that "because the owners of a majority of the future interests in the Allotment did not consent to the [right-of-way] renewal, the [BIA] did not err in refusing to issue an unqualified 20-year renewal."

Significantly, it appears that this controversy led the Department of the Interior ("DOI") to engage in rulemaking regarding whether remaindermen consent should be required for rights-of-way. In 2014, the DOI proposed a rule that would have permitted holders of life estates to

---

[3] On September 4, 2014, while its appeal of the BIA's decision was apparently pending, Western Refining filed a lawsuit in this Court seeking under 25 U.S.C. § 357 to obtain by eminent domain the right to continued presence and operation of its pipeline across Allotment No. 2073. *See Western Refining Southwest, Inc. v. 3.7820 Acres of Land In McKinley County, New Mexico,* 14cv804 KG/KK, Complaint, Doc. 1. That case has been stayed pending the final outcome of this appeal of the administrative proceedings. *See id*. at Docs. 166 and 172.

consent to a right of way for the duration of their estates. However, in late 2015 the DOI settled on a different rule requiring consent not only from the holder of a life estate, but also from the holders of the majority of the remainder interest. 25 C.F.R. § 169.109 (2016). This regulation went into effect in April of 2016 and does not apply to the controversy currently before the Court.

## DISCUSSION

Western has sued the United States and asks this Court to set aside the IBIA requirement of remaindermen consent on the grounds that it is improperly retroactive and contrary to law, including the General Right-of-Way Act of 1948, 25 U.S.C. §§ 323-328, and applicable Department of Interior regulations. Western contends that the IBIA's 2013 and 2016 decisions overturning renewal and then denying unqualified 20-year renewal of the right-of-way on Allotment No. 2073 are final agency actions reviewable under the Administrative Procedures Act (APA). Western asks for a declaration that consent of the majority of *current* owners, and not of their remaindermen, is all that was required under the General Right-of-Way Act and then-existing regulations governing its right-of-way renewal applications, and that the BIA's 2010 renewal of the easement for a 20-year term is valid. Western also asks the Court to enjoin the Defendant to approve a renewal of its 20-year unqualified right-of-way over Allotment No. 2073.

## I. Did the IBIA Improperly Create and Apply a New Rule Retroactively?

Western argues first that in ruling on remaindermen consent, the IBIA created a new rule and applied it retroactively in violation of limitations on retroactive rulemaking. Western's argument has two parts. First it relies on Tenth Circuit decisions limiting an agency's ability to use administrative adjudicatory proceedings to overthrow a rule on which a party has previously

relied. Next, it argues that principles of due process and equal protection require—via the five-factor test set forth by the Tenth Circuit in *Stewart Capital Corp. v. Andrus*, 701 F.2d 846, 848 (10th Cir. 1983)—that the Court reverse the IBIA's ruling. Neither argument is persuasive under the facts of this case.

      A.      <u>Imposing new, retroactive rules through administrative adjudicatory proceedings</u>

Western argues that the Tenth Circuit's decisions in *De Niz Robles v. Lynch*, 803 F.3d 1165 (10th Cir. 2015) and *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142 (10th Cir. 2016) demonstrate that the IBIA created a new rule through its adjudication procedures and then wrongfully applied it retroactively to overturn the BIA's renewal of Western's easement. Western contrasts this adjudicatory action with the Department of Interior's rulemaking process requiring public notice and opportunity to comment prior to promulgation of a new regulation, which is then applied prospectively. According to Western, the Tenth Circuit cases prohibit the IBIA's actions in this case. However, the two cases Western cites simply do not apply in the circumstances presented here.

In *De Niz Robles v. Lynch*, 803 F.3d 1165 (10th Cir. 2015), two immigration statutes were at odds, one giving the Attorney General discretion to "adjust" the immigration status of certain persons who have entered the country illegally, the other significantly limiting that discretion. *Id*. at 1167. Confronted with that statutory tension, the Tenth Circuit held that the AG's discretion remained intact. *Id*. (citing *Padilla-Caldera v. Gonzales*, 426 F.3d 1294 (10th Cir. 2005)). In reliance on the *Padilla-Caldera* decision, De Niz Robles filed a petition with the AG to adjust his status. However, his petition languished for years, and before the AG ruled on it the Board of Immigration Appeals issued a decision that was directly opposed to *Padilla-Caldera*, concluding that the AG lacks the discretion to adjust the status of individuals like De

Niz Robles who entered the country illegally. *See In re Briones*, 24 I. & N. Dec. 355 (BIA 2007). When the Board of Immigration Appeals finally got around to hearing De Niz Robles' petition, it followed *Briones*, not the Tenth Circuit's opinion in *Padilla-Caldera*, and held that De Niz Robles was ineligible for adjustment of his status and therefore subject to removal. *Id*. at 1168. This meant that De Niz Robles had wasted years in justifiable reliance on the earlier decision in *Padilla-Caldera*, when he could have been pursuing his remedies under *Briones* instead. The question in *De Niz Robles* was whether it was proper for the Board of Immigration Appeals to apply its new rule in *Briones* retroactively to someone who had relied on the earlier rule set forth by the Tenth Circuit in *Padilla-Caldera*. The court concluded that it was not.

As the Tenth Circuit explained in *De Niz Robles*, typically executive agencies cannot overrule federal courts when it comes to interpreting the law. 803 F.3d at 1167. An exception applies when a statutory scheme is ambiguous, in which case Congress has delegated policy-making responsibilities to the agency and the courts must defer to the agency's policy choice, provided that choice is reasonably consistent with the legislative scheme. *Id*. (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984)). Further, under these circumstances courts must defer to the agency even when doing so means that court must overrule its own previous statutory interpretation. *Id*. (citing *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005)). However, in a very lengthy and detailed opinion, the Tenth Circuit explained why under the circumstances in *De Niz Robles*, it was improper for the Board of Immigration Appeals to apply its rule *retroactively*. One of the chief reasons is that "[i]n the *Chevron* step two/ *Brand X* context, it's easy to see the 'ill effect[s]' of retroactivity: upsetting settled expectations with a new rule of

general applicability, penalizing persons for past conduct, doing so with a full view of the winners and losers—all with a decisionmaker driven by partisan politics." 803 F.3d at 1176.

In the *De Niz Robles* decision upon which Western relies, the Tenth Circuit explained, clearly and repeatedly, that it was talking about "a *Chevron* step two/*Brand X* scenario." To clarify, under the *Chevron* analysis, "step two" is reached when "the statute is silent or ambiguous with respect to the specific issue, [and] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The *Chevron* element is satisfied in the present dispute because both parties agree that neither the General Right-of-Way Act of 1948 nor any other applicable federal statute addresses the question of whether remaindermen consent is required for renewal of a right-of-way on an Indian allotment, and the IBIA's reasoning is based on a permissible construction of the statute.

However, in order for *De Niz Robles* to apply, the factual circumstances must also fit with *Brand X*. In a *Brand X* scenario, a federal court is obliged to overrule its own previous pronouncement on the silent or ambiguous statute in favor of a more recent decision by a federal agency entrusted with policy-making responsibilities. *Brand X*, 545 U.S. at 981-83. This element is *not* satisfied here; the parties point to no previous ruling by any federal court addressing the question of remainderman consent. For that matter, Western cannot point to a previous ruling by a federal agency. Instead, Western asserts that it "relied on existing rules and BIA practices in renewing a right-of-way," but it cites nothing in the record supporting that statement, leaving the Court to wonder as to the exact nature of those previous rules and practices. The absence of this information is odd, considering so much of Western's argument depends upon the contention that it relied on a well-established practice which did not require remaindermen consent. In any event, because there was no previous judicial pronouncement on remaindermen consent, this

case does not present a *Brand X* scenario and therefore is not governed by the caution against retroactivity set forth in *De Niz Robles*.

It appears that the "reliance interest" that Western actually seeks to protect is its reliance on the BIA's initial 2010 decision approving Western's request for the renewal. One result of that reliance was Western's payment to the interest holders. However, it is common in the course of litigation for a party to appeal an initial decision, as Adakai did here. As the appellee, Western knew the that there was a risk that the decision could be reversed. There is nothing unusual about that. If every party that prevailed in litigation could prevent subsequent appellate reversals by taking action in reliance on the lower court's decision, then appellate reversals could be halted universally. That is not the law.

B.     Application of the *Stewart Capital* Factors

Next, Western argues that the IBIA has violated "every protection against retroactive agency adjudication," citing the five-factor test set forth in *Stewart Capital Corp. v. Andrus*, 701 F.2d 846, 848 (10th Cir. 1983). Those factors, which are meant to guide a court in determining whether an agency decision should be applied only prospectively, are:

> 1. Whether the particular case is one of first impression;
> 2. Whether a new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of the law;
> 3. The extent to which a party, against whom the new rule is applied, relied on the former rule;
> 4. The degree of burden which a retroactive order imposes on a party; and
> 5. The statutory interest in applying a new rule despite reliance of a party on an old standard.

*Id*. at 848. According to Western, the act of requiring remainderman consent violates all five factors. The Court disagrees.

As to the first factor, both parties agree that remaindermen consent was an issue of first impression for the BIA and the IBIA. No then-existing statute or rule answered the question of

whether the holder of a life estate could give unqualified consent to the renewal of a right-of-way without the consent of all or some of the remaindermen.

However, as to the second factor, it is far from clear that the IBIA's ruling represented an abrupt departure from a well-established practice on remaindermen consent. In fact, the record contains no evidence whatsoever regarding the BIA's established practice, if any, prior to this case. Western asserts that "[s]ettled practice limited right-of-way consents to current owners." Doc. 44 at 11. However, Western cites to no evidence of such a practice. Western gives no examples of previous instances in which the owner of a life estate was permitted to consent to an unqualified right-of-way without the consent of his or her remaindermen. Further, it appears that in their written decisions neither the BIA nor the IBIA considered or even mentioned any previous or established practice as to remaindermen consent. Quite simply, the record is devoid of any evidence of such a practice—there is only the unsupported assertion in Western's brief.

The third factor is also not satisfied here, because—for the reasons previously discussed—there is no evidence that Western relied upon any former rule or even a routine practice by the IBIA or the BIA. Indeed, there is no evidence that there was any rule or previous IBIA ruling in place when the IBIA issued its 2013 decision requiring remaindermen consent. As the DOI aptly points out, "for reliance to establish manifest injustice, it must be reasonable— reasonably based on settled law contrary to the rule established in the adjudication. The mere possibility that a party may have relied on its own (rather convenient) assumption that unclear law would ultimately be resolved in its favor is insufficient to defeat the presumption of retroactivity when that law is finally clarified." *Qwest Services Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007). Western suggests that it has demonstrated reliance with the fact that it paid above-market compensation to the current owners of interests in the Allotment. However, a party

cannot create reasonable reliance through its own actions; rather, the third *Stewart Capital* requires a party to demonstrate that it relied reasonably on a prior established rule. Western has failed to do that. In the absence of any controlling statute, regulation, or prior IBIA ruling, it appears that Western merely assumed that it need not obtain remainderman consent.

Fourth, the Court must weigh the degree of the burden that the IBIA's retroactive decision imposes on Western. As Western points out, retroactive application of the IBIA's ruling will make it both more complicated and more expensive for Western to obtain the consents it needs to obtain the unqualified right-of-way it seeks—and this many years after 2010, when it obtained consents and paid compensation for the right-of-way. However, Western is not entirely without remedy, as it may attempt to obtain consent from additional landowners in order to reach a minority; it need not limit itself to the eight original interest holders and their remaindermen. Further, as the DOI points out, Western has obtained the right to a qualified right-of-way pursuant to the IBIA's 2016 decision. Finally, Western has filed a lawsuit seeking to obtain the right-of-way via eminent domain. Thus, there is a burden on Western, but it is not unreasonably heavy.

Finally, the fifth element—whether and to what extent there is a statutory interest in applying a new rule despite reliance of a party on an old standard—is not fulfilled here. As previously discussed, Western has not shown that it reasonably relied on an old standard that has now been overturned by the IBIA's ruling.

Having weighed each of the *Stewart Capital* factors, the Court concludes that the IBIA's decision requiring remainderman consent may be applied retroactively to Western.

## II. Did the IBIA Improperly Rely on Principles of Common Law in a Manner That Is Arbitrary and Capricious?

Western's second argument is that it was legally erroneous for the IBIA to rely upon principles of general property law in determining whether the owners "of a majority of the interests" granted their consent to the right-of-way. *See* 25 C.F.R. § 169.3(c)(2) (Apr. 1, 2015) Western contends that "Indian allotment ownership has little in common with general property law." Doc. 44 at 12. In response, the DOI argues that it was appropriate for the IBIA to turn to common law—as it and other federal agencies often do—to resolve a question unanswered by the 1948 Act and its related regulations. The DOI contends that it applied the law properly, and that the IBIA's decision is entitled to deference.

### A. Reliance on Common Law

The question of how to calculate the percentage of undivided interest in an allotment that has given consent to a right-of-way when part of that interest rests in a life estate is one not answered by the 1948 Act or any then-existing regulation—that much is undisputed. As a result, under *Chevron* the question for this Court is whether the IBIA's answer to that question is based on a permissible construction of the statute. Western argues that the IBIA's ruling is not entitled to *Chevron* deference, and that even if it is entitled to such deference, the Court should find that the IBIA's decision was arbitrary and capricious.

#### 1. *Chevron deference*

According to Western, "[b]ecause [the IBIA] has no special expertise in general property law, and was acting under a legal misconception, its decision gets no judicial deference." Doc. 44 at 12. However, the cases cited by Western for this point are inapposite. In *Flores-Molina v. Sessions*, 850 F.3d 1150, 1157 (10th Cir. 2017), the Tenth Circuit refused to give deference to a decision by a single member of the Board of Immigration Appeals because "[a] decision made

by a single board member … is not precedential within the agency and therefore ordinarily is not entitled to deference" and because the decision did not rest on "a prior precedential BIA decision addressing the same question." *Id*. (internal citation and quotation omitted). That is not the situation here; there is no indication in the record that either IBIA decision was made by a single board member. Western relies on another case involving the Board of Immigration Appeals, *Ibarra v. Holder*, 736 F.3d 903, 918 and n.19 (10th Cir. 2013), where the court refused to defer to the Board's definition of a term found in criminal statutes because the Board had been inconsistent in defining it, the definition at issue was "so far outside the interpretive gap left by Congress," and "the interpretation and exposition of criminal law is a task outside the [Board of Immigration Appeal's] sphere of special competence." *Id*. Again, that is not the situation here, where interpreting the General Right-of-Way Act of 1948, with all its implications for Indian property rights, is within the IBIA's mandate. Thus, the Court concludes that *Chevron* deference does apply to the IBIA's decision.

### 2. *Differing Legal Principles*

Next, Western argues that the principles of property rights set forth in the General Right-of-Way Act of 1948 are so different from those in the common law that it was improper for the IBIA to turn to the common law to help fill a gap in the statute and then-existing regulations. In support of its argument, Western cites several examples of instances in which the 1948 Act diverges from the common law. For example, as Western correctly points out, under the common law all of the owners of an estate must consent to an easement. *See* Restatement (Third) of Property (Servitudes) § 2.3 (2000). Similarly, under the common law one may obtain an easement through prescriptive use in certain circumstances. *Id*. at § 2.17. In contrast, because the United States holds title to Indian allotments in trust, certain typical individual property rights do

not apply. For example, under the General Right of Way Act of 1948, the BIA can approve a right-of-way based on simple majority consent of the owners, 25 U.S.C. § 324(1), and it may grant approval when the heirs of a deceased owner are unknown. Id. at § 324(3). Because the 1948 Act differs from the common law in this way, Western suggests that it is inappropriate to look to the common law to fill gaps in the statutory scheme.

In response, the DOI argues that it is typical for agencies to look to the common law, particularly when a statute leaves a particular question open for interpretation:

> "[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident. . . . In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.

*United States v. Texas*, 507 U.S. 529, 534 (1993). The DOI also cites examples of federal agencies, including agencies within the DOI, applying the common law to the fill gaps in legislative and regulatory schemes.

While the DOI acknowledges that the 1948 Act "deviates from some common law rules so as to address . . .the practical difficulties of obtaining consent from all landowners of highly-fractionated lands," Doc. 45 at 24, it also argues that the statute creates greater protections for Indian owners of allotments than does the common law. Specifically, it points to the statutory requirements of notice and consent to an easement and just compensation for grantors, as well as the prohibition against easements by adverse possession, prescription, or condemnation by the states. The DOI contends that these provisions show a Congressional intent to afford owners of interests in allotments even greater protection than that afforded by the common law, suggesting that requiring remainderman consent is consistent with that heightened protection.

3. *The purpose of the 1948 Act*

These arguments overlap somewhat with those in Part II(A)(2), *supra*.

Western argues that the 1948 Right-of-Way Act evinces a statutory purpose that is contrary to the common law concepts evident in the IBIA's ruling requiring remainderman consent. That is, Western argues that the goal of the 1948 Act was to facilitate rights-of-way over fractionated Indian land allotments. Western cites *Perry v. Navajo Area Director*, 31 IBIA 186, 189 (1997), a right-of-way case in which the Area Director of the BIA exercised his power under the 1948 Act and the implementing regulations to consent to a right-of-way on behalf of the owners of an allotment who were minors, *non compos mentis*, or whose whereabouts were unknown. When those consents were given by the BIA, a majority of the landowners had consented and the right-of-way was granted. The appellant, an owner who did not consent to the easement, argued that only those owners who personally consented may be counted in determining whether a majority of owners had consented. However, the IBIA observed that it was "the continuing intent of Congress to facilitate the beneficial use of fractionated lands." *Perry*, 31 IBIA at 189. According to Western, the IBIA's decision here requiring remainderman consent is contrary to this statutory purpose because it has made the consent process more burdensome and has "caused this process to further fractionate allotments into present and future interests." Doc. 44 at 14. In other words, parties like Western who seek a right-of-way have to obtain the consent of not only the holders of life estates, but also their remaindermen, thereby making it more difficult to obtain majority consent.

While in *Perry* the IBIA did observe that in enacting the 1948 Right-of-Way Act Congress intended to facilitate the beneficial use of fractionated lands, that is not the only purpose of the statute. As the DOI points out, another evident purpose is to give heightened protection to Indians to prevent their interests in land from being unfairly compromised. *See,*

*e.g., Loring v. United States*, 610 F.2d 649, 651 (9th Cir. 1979) (observing that the Right-of-Way Act protects Indian allotments from improvident grants of rights-of-way); *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 552 (9th Cir. 1983) (holding that statute governing rights-of-way over tribal land was intended to protect Indian interests and must be liberally construed in favor of Indians). This purpose is evident in the provisions requiring that Indian landowners give consent and receive just compensation for any grant of right-of-way. *See* 25 U.S.C. §§ 324-325. As a general matter, statutes enacted for the protection of Indians must be broadly construed in the Indians' favor. *See Antoine v. Washington*, 420 U.S. 194, 199-200 (1975); *Morton v. Ruiz*, 415 U.S. 199, 236 (1974).

### B.    The nature of "gift deeds"

Western also argues that the IBIA erred by relying upon the common law, and then compounded the error by rejecting Western's contention that the relevant Native American "gift deeds" ensure that all power to encumber the Allotment resides in Mr. Morgan and Ms. Tom. More specifically, Western contends that the virtually identical "gift deeds" by which Mr. Morgan and Ms. Tom created their life estates in Allotment No. 2073 are simply a way of creating heirs without limiting their own rights to consent to easements beyond their lifetimes. Western points to the language of the gift deeds, which are on BIA-approved forms. Those gift deeds state that in exchange for "love and other considerations," Mr. Morgan and Ms. Tom conveyed all "right, title and interest" in the Allotment to their remaindermen, but reserved for themselves life estates during which Mr. Morgan and Ms. Tom retain "all income including surface, subsurface leases and any other sources." *See, e.g*., AR 1452, 1455. According to Western, these instruments show that despite the grant, Mr. Morgan and Ms. Tom continue to have unlimited power to encumber their property beyond their lifetimes.

As evidence of this, Western points to language in the American Indian Probate Reform Act ("AIPRA"), 25 U.S.C. § 2201(10), that is consistent with the gift deeds. Western contends that these deeds created a "life estate without regard to waste" under AIPRA, which sets forth the following definition: "'without regard to waste' means, with respect to a life estate interest in land, that the holder of such estate is entitled to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen." *Id*.; *See* Doc. 44 at 15. Western then points out that the federal regulations under AIPRA give holders of life estates without regard to waste the power to deplete the resources of the subject property; according to Western, this implies that a life estate holder's rights to the property are unlimited such that they may also encumber the property *beyond* their lifetime. It then concludes that there is no evidence that in creating a life estate, Mr. Morgan or Ms. Tom intended to surrender their power to encumber the property beyond their lifetimes.

In response, the DOI points out that the IBIA rejected this argument, and that Western fails to point to any error in the IBIA's reasoning. It also points out that AIPRA does not apply to the gift deeds at issue here. Specifically, Mr. Morgan's gift deed was signed (and his life estate created) before AIPRA and the relevant regulatory provisions were in effect. Ms. Tom's life estate, though created after AIPRA went into effect, is unaffected because it was created by a conveyance document after June 20, 2006. Western does not dispute that AIPRA does not apply to Mr. Morgan's and Ms. Tom's life estates but dismisses these arguments as "hyper-technical."

The IBIA rejected Western's argument, *see* AR 22-25, and the Court can find no fault with its reasoning. The language of the gift deeds reserves for the life tenants all the income from the property during their lifetimes. Nothing in this plain, simple language suggests that the life

tenants retained, or even intended to retain, the right encumber the property beyond their lifetimes.

C. <u>**Analysis**</u>

The 1948 Right-of-Way Act and the implementing regulations in force during the relevant time period are silent as to whether an Indian who holds a life estate in an allotment may grant a right-of-way beyond his or her lifetime. The Court has already determined that the IBIA's decision is entitled to *Chevron* deference. Thus, the question is whether the IBIA's decision is based upon a permissible construction of the statute. The Court concludes that it is.

"Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952). Here, the statute in question has at least two relevant purposes—to give heighted protection to the property rights of Indians on one hand, and to facilitate the beneficial use of fractionated lands on the other. Under certain circumstances, those purposes can be in conflict; to some extent, that appears to be the case here. Requiring a majority of remaindermen to consent to a right-of-way that extends past the lifetime of the holder of a life estate does make it more difficult for companies like Western who seek the use of Indian allotments. Such a requirement does not precisely "facilitate" the use of fractionated lands. On the other hand, looking to the common law when the statute is silent does give greater protection to the property rights of Indian remaindermen.

In this case, the Court cannot say that the IBIA's decision to require remainderman consent is based on an impermissible construction of the 1948 Right-of-Way Act or an unreasonable decision to look to the common law. The question is not whether this Court would have reached the same result or whether the IBIA reached the best decision under the

circumstances. Rather, this Court's review is much less exacting, asking only if it was reasonable for the IBIA to construe the statute in the manner that it did. This is not to say that the arguments advanced by Western are without merit. However, as discussed above it is quite common for federal agencies to turn to the common law to fill gaps left in statutory schemes. As discussed above, the common law upon is not entirely at odds with the purpose of the 1948 Right-of-Way Act. And, as previously discussed, neither the language of the gift deeds nor AIPRA leads the Court to a different conclusion.

Thus, the Court concludes that the IBIA did not err in relying upon the common law to conclude that remaindermen consent was necessary under the circumstances presented.

## III. Was the IBIA's Failure to Give Notice Arbitrary and Capricious?

Western's third argument is that the IBIA acted in a manner that was arbitrary and capricious when in 2013 overturned the BIA's grant of an unqualified right-of-way on a legal issue that it raised *sua sponte*. No party before the BIA or the IBIA had raised the issue of whether the owner of a life estate holds the power to grant a right-of-way that extends past his or her lifetime. No remainderman had asserted his rights. Rather, the IBIA raised the issue on its own, and then decided it without giving the parties an opportunity to be heard. The IBIA defended its action by asserting that the issue had been "addressed" in the BIA Regional Director's brief, which although it did not discuss the rights of remaindermen vis-à-vis the grant of a right-of-way, did "defend[] the sufficiency of the documentation relied upon by BIA." AR 0586. The IBIA also said that it had "authority to address the issue to correct manifest error," citing 43 C.F.R. § 4.318. AR 0586. That regulation provides:

> An appeal will be limited to those issues that were before the administrative law judge or Indian probate judge upon the petition for rehearing, reopening, or regarding tribal purchase of interests, or before the BIA official on review. However, except as specifically limited in this part or in title 25 of the Code of

Federal Regulations, the Board will not be limited in its scope of review and may exercise the inherent authority of the Secretary to correct a manifest injustice or error where appropriate.

The Court finds both of the IBIA's justifications for its actions lack merit.

First, in its Answer Brief, AR 0663 et seq., the BIA Regional Director explained how the fractionated ownership interest in Allotment No. 2073 had been documented and calculated to reach a number greater than 50%. *See* AR 0673-74. However, the brief did not address the question of whether Mr. Morgan could grant consent for his fractionated interested to the exclusion of his remaindermen, because that issue was not raised by Mr. Adakai in his appeal, nor did any other party question Mr. Morgan's power to consent. Thus, the BIA Regional Director would not have reason to discuss it in the Answer Brief. By raising it for the first time in its decision, the IBIA went beyond the scope of the appeal before it. This is in contravention of 43 C.F.R. § 4.318, which states that in ruling on appeal the IBIA is limited to the issues that were before the BIA.

Second, there was no "manifest error" in the BIA's decision that would justify the IBIA's actions in ruling on a new legal issue without giving the parties an opportunity to be heard. According to Black's Law Dictionary, "manifest" means clear, obvious, and unquestionable. Thus, "manifest error" is defined as "An error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." Black's Law Dictionary 243-44 (11th ed. 2019). As previously discussed herein, it was far from plain or obvious whether remaindermen consent is required under the circumstances presented here. The statute is silent, and at the time there were no regulations on point. The Tenth Circuit has stated that "a matter of first impression will generally preclude a finding of plain error." *United States v. Turrietta*, 696 F.3d 972, 981 (10th Cir. 2012). In addition, there was no manifest injustice to

be cured. One party or another would be prejudiced financially, whatever the outcome. The IBIA did not cure manifest injustice (and nor did it claim to) by raising this issue and ruling upon it without give the parties an opportunity to brief it.

None of the cases cited by the DOI alter this analysis. The DOI contends that the IBIA has the inherent authority to fill the gap left by the 1948 Right-of-Way Act and applicable regulations and to redress manifest error. That is beyond dispute. However, that unassailable fact does not reach the question here, which is whether the IBIA has the authority to both raise and decide an issue of first impression *sua sponte* without first giving the parties an opportunity to be heard. The cases the DOI cites are inapplicable because each of them involves a plain error that was obvious on the face of the record—a mathematical miscalculation or the omission of an heir in determining majority consent. *See, e.g., Hopi Tribe v. W. Reg'l Dir.*, 62 IBIA 315, 328 (2016) (finding manifest error where BIA's narrative explanation of calculation of grazing fees was not in accord with mathematical calculations); *Ward v. Billings Area Dir.*, 34 IBIA 81, 90-91 (1999) (finding manifest error where BIA made mathematical mistakes in calculating damages); *Estate of Paul Widow*, 17 IBIA 107, 114 (1989) (omission of heirs in probate proceeding is manifest error justifying reopening of the case). Not one of these cases involved a legal issue of first impression being decided without argument from the parties.

Finally, the DOI also suggests that Western has waived this argument because it failed to argue it before the IBIA. Of course, there is no way that Western could have made this argument in 2013, because the IBIA raised the matter *sua sponte* and then remanded the case to the BIA. In 2014, Western could not have argued to the BIA that the IBIA erred in ruling on a new *issue sua sponte*, because the BIA has no authority to review the actions of the IBIA. This means that the only opportunity Western would have had to preserve the issue was before the IBIA in 2016,

when Western appealed the BIA's 2013 decision after remand. Essentially, the DOI contends that Western was required to ask the IBIA to reconsider its 2013 decision in order to preserve its argument in this Court. However, as Western correctly points out, under the applicable regulations Western is not required to ask the IBIA for reconsideration because "[t]he filing of a petition for reconsideration is not required to exhaust administrative remedies." 42 C.F.R. § 4.314(c). This is consistent with exhaustion requirements under the APA generally. *See Darby v. Cisneros*, 509 U.S. 137, 146 (stating that § 10(c) of the APA "relieve[s] parties from the requirement of petitioning for rehearing before seeking judicial review (unless, of course, specifically required to do so by statute)"). Thus, Western has not waived its right to appeal the IBIA's *sua sponte* decision on remainderman consent.

Accordingly, the Court concludes that the IBIA was arbitrary and capricious in denying Western's application for right-of-way based on a legal issue that was one of first impression and which none of the parties raised or were permitted to brief prior to the IBIA's decision. Thus, Western's appeal should be granted.


**IT IS THEREFORE ORDERED** that the IBIA's decisions overturning the twenty-year renewal of Western's right-of-way over Allotment No. 2073 are hereby **REVERSED**.




**UNITED STATES DISTRICT JUDGE**